UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

MICHAEL MEADOR,                        )
                                       )
      Movant,                   )
                                       )
   vs.                            )     Case No. 1:12CV36 CDP
                                       )
UNITED STATES OF AMERICA,              )
                                       )
     Respondent.               )

## MEMORANDUM AND ORDER

Movant Michael Meador is currently incarcerated at the Terre Haute Federal

Correctional Complex in Terre Haute, Indiana. A jury convicted Meador on three

counts related to a conspiracy to distribute marijuana and the murder of Sergio

Burgos. Case No. 1:06CR134CDP. Meador was sentenced to life imprisonment,

and his conviction and sentence were affirmed on consolidated appeal. *United*

*States v. Dinwiddie*, 618 F.3d 821 (8th Cir. 2010). His petition for certiorari was

denied by the United States Supreme Court. *Meador v. United States*, 131 S. Ct.

1547 (2011).

Now before me is Meador's motion to vacate, set aside, or correct sentence

under 28 U.S.C. § 2255. Meador has also filed a motion "pursuant to rule

12(b)(3)(B) or in the alternative a motion for a writ of error coram nobis" and a

motion to "clarify" his previous brief. I will deny the § 2255 motion to vacate and

the related motions without an evidentiary hearing. Meador's extensive filings raise many issues that are either clearly refuted by the record or that appear to have been created by Meador from whole cloth. Additionally, although he raises new claims about prosecutorial misconduct that were never raised before, his ineffective assistance of counsel claims largely reargue many of the same issues previously rejected by the Court of Appeals. None of the claims or arguments has merit.

## Procedural Background

Meador was charged along with three co-defendants with several crimes arising out of the drug-related murder of Sergio Burgos. Meador and his co-defendant Dennis Dinwiddie were convicted at separate trials. Co-defendant Lawan James pleaded guilty and testified first at Dinwiddie's trial, and then, two months later, at Meador's trial. After those three defendants were convicted, the United States dismissed the charges against co-defendant Raul Cruz, who was at that time facing Missouri state felony-murder charges arising out of the same incident.

Meador was convicted by a jury of: conspiracy to distribute marijuana in excess of 50 kilograms (Count I), interstate travel in aid of racketeering enterprise (Count II), and possession of a firearm in furtherance of a drug trafficking crime that resulted in murder (Count III). I sentenced him to 240 months in prison on

Count I, life imprisonment on Count II, with the sentences from Counts I and II to be served concurrently, and life imprisonment on Count III, to be served consecutively to the sentences on the other counts.

Meador's original § 2255 motion raised the following grounds:

1. His due process rights were violated because the government presented inconsistent theories at his and Dinwiddie's trials.

2. He was denied due process because the government did not call Raul Cruz to testify.

3. His trial counsel was ineffective in a myriad of ways.

4. His appellate counsel was ineffective in a myriad of ways.

Meador also filed a "Motion to Amend," adding the following ground:

5. "Petitioner was denied due process of law and a fair trial, when counsel for the government engaged in misconduct by seeking to win a conviction rather than insuring that justice was provided."

This ground essentially reargues the issue in ground 2 – that the government should have called Cruz to testify. Although no affidavits were attached to the original motion, Meador filed a lengthy reply brief, which attached affidavits from himself and Dinwiddie, and from three friends.

## Evidentiary Facts

The appeals of Meador and Dinwiddie were consolidated, and the Eighth Circuit set forth the facts supporting their convictions:

Sergio Burgos Gonzales (Burgos) was part of a conspiracy to distribute marijuana with Dinwiddie and Meador. Burgos shipped

marijuana from Texas via express mail services to Dinwiddie in Tennessee and Meador in Missouri. After the marijuana was distributed, Burgos visited Dinwiddie and Meador to collect payment.

On January 25, 2006, Burgos shipped approximately fifty pounds of marijuana to Dinwiddie. Police intercepted the shipment and made a controlled delivery in Clarksville, Tennessee, while surveilling the residence to which the delivery was made. Police observed Dinwiddie outside of the residence, holding what appeared to be a packing slip from the delivery. Police approached him, asking him if he possessed any weapons or drugs. Dinwiddie said no and consented to a search of his person and vehicle. During the search, police recovered from Dinwiddie's pants pocket a packing slip from one of the packages in the shipment that had just been delivered. When asked about his involvement in the shipment, Dinwiddie stated that he was a middleman for Burgos. Police confiscated the marijuana, but did not make any arrests.

Less than a week later, Dinwiddie, Meador, and Burgos met in Tennessee at which time they concocted a plan wherein Meador would travel to Texas with Burgos to purchase more marijuana. Dinwiddie provided Meador with $10,000 for the transaction. During the trip, Burgos expressed anger at Dinwiddie and speculated that Dinwiddie might have stolen the drugs that were seized as a result of the controlled delivery. In Texas, Meador gave Burgos the $10,000 to purchase marijuana and Burgos took the money, promising to do so. Burgos, however, did not return with the marijuana.

Meador informed Dinwiddie that Burgos had left with the money and failed to return with the drugs as planned. Meador traveled to Tennessee and was picked up by Dinwiddie in Memphis. As they drove together to Clarksville, Dinwiddie expressed anger at Burgos. Meador indicated that he could locate Burgos and agreed to arrange a future meeting between Dinwiddie and Burgos. After returning to Missouri, Meador spoke with Burgos and told him that they could continue doing business without Dinwiddie. In March 2006, Burgos shipped a package of marijuana to Meador in Missouri. Shortly thereafter, Burgos met Meador to collect his payment. Looking forward, they agreed that Burgos would personally bring 200

pounds – a larger than normal amount – of marijuana to Meador in April.

On April 21, 2006, Burgos arrived at Meador's grandmother's house in New Madrid, Missouri, with 200 pounds of marijuana, accompanied by an associate, Raul Cruz. Meador and Michael Jeremy Hunt, an associate of Meador's, immediately began preparing the marijuana for distribution to local customers and began distribution that night, collecting $40,000. The plan was for Burgos to return to the house the following morning to receive payment for the marijuana. Meador called Dinwiddie to tell him that Burgos was in Missouri. Dinwiddie acquired a .45 caliber handgun from his girlfriend, Genalle Brown; recruited Lawan James, an old friend, to accompany him; and proceeded to New Madrid.

When Dinwiddie met Meador in New Madrid, they discussed the February 2006 incident in which Burgos absconded with Dinwiddie's $10,000. Meador encouraged Dinwiddie to confront Burgos. Meador and Dinwiddie then drove to the hotel at which Burgos was staying. Meador cautioned Dinwiddie not to confront Burgos at the hotel because of the risk that Burgos might escape. Dinwiddie complied and returned to Meador's grandmother's house, where, at Meador's direction, he concealed his car behind the house to hide it from Burgos's sight. At Dinwiddie's request, Meador retrieved his grandmother's .32 caliber handgun and gave it to James.

When Burgos and Cruz approached the house the following morning, Meador directed Dinwiddie, James, and Hunt to hide so that Burgos would not flee at the sight of them. Meador and Hunt hid in the bathroom. When Burgos entered the house, he called for Meador. Dinwiddie confronted Burgos, pistol-whipped him, and forced him into the bedroom, where Dinwiddie demanded to know where the $10,000 was and why Burgos had disappeared with the money. Burgos said that he had acted out of fear, that his cousin Mario had made off with money, and that it could not be returned. An argument ensued between Dinwiddie and Burgos about the intercepted drug shipment.

Dinwiddie asked Burgos if he had called him a "bitch," as Meador had related. Dinwiddie then shot Burgos once in the groin.

Burgos beseeched Dinwiddie to spare his life. According to James, Dinwiddie replied, "Who's a bitch now?," and shot Burgos again, this time in the head. Dinwiddie then ordered James to shoot Burgos. James, using the .32 caliber handgun provided by Meador, shot Burgos once in the back.

Frightened by the commotion, Meador and Hunt broke out of the bathroom window and retrieved guns from a neighboring house. Meador acquired a shotgun and Hunt picked up a carbine. Meador directed Hunt to keep the carbine trained on Dinwiddie when he exited the house. Meador told Hunt to shoot Dinwiddie if he made an aggressive move. Dinwiddie and Meador spoke and the guns were put down.

At Dinwiddie's direction, James and Cruz loaded Burgos's body into Burgos's car. Dinwiddie, James, and Cruz drove to a nearby location and discarded Burgos's body in a road-side ditch. Meador and Hunt cleaned up the room in which Burgos had been murdered, burning bloody linens and Burgos's and Cruz's cell phones. Dinwiddie gave some of Burgos's marijuana to James and Meador gave some of Burgos's marijuana to Hunt. Meador told Hunt to lay low for a while and that they could resume the marijuana business with Dinwiddie in the future. Dinwiddie and James discarded the handguns by throwing them out the window while driving back to Tennessee. During this ride, James asked Dinwiddie about Dinwiddie's order to shoot Burgos. According to James, Dinwiddie replied, "Everybody had to play their part."

Burgos's body was found by police shortly after it was discarded. Police connected Burgos to Dinwiddie based upon a report filed by the Texas Department of Public Safety regarding the intercepted drug shipment in January. Investigators located Hunt at his sister's house in Dyersburg, Tennessee. Hunt, fearful for his life, spoke candidly to police about the murder and identified Dinwiddie as one of the perpetrators. Shortly thereafter, Meador learned that Hunt had spoken to police. Meador then went to police in St. Genevieve, Missouri, to talk about the murder. Meador was less than candid, telling police that a group of unknown Haitians had murdered Burgos and denying any personal association with the killers.

Upon being arrested, James cooperated with investigators and explained what had happened in New Madrid. He led police to the area in Missouri where he and Dinwiddie had discarded the handguns used to kill Burgos. After a multi-day search, police recovered a .45 caliber handgun. Subsequent forensic analysis matched a .45 caliber shell found at the murder scene to the recovered handgun. Police obtained a search warrant for Dinwiddie's residence and an arrest warrant for Dinwiddie. At Dinwiddie's residence, police recovered a pair of blue jeans with blood stains and an April 22, 2006, receipt for gas from a truck stop in Missouri.

*Dinwiddie*, 618 F.3d at 827–29.

Because many of Meador's arguments relate to the specific testimony of witnesses, I will summarize some of the testimony on which the Court of Appeals based its statement of facts. The government presented nineteen witnesses. Of the people mentioned in the Court of Appeals' summary above, Lawan James, Jeremy Hunt and Genalle Brown all testified, as did Meador's brother Billy, Burgos's girlfriend Maria Alanis, and numerous law enforcement witnesses. Meador himself did not testify, but substantial portions of his video-recorded statement attributing the murder to unidentified Haitians were played.

Billy Meador testified that he was present when Michael Meador met with Dinwiddie in Tennessee in February and obtained the $10,000 and a gun for the Texas trip. Billy Meador went with Michael Meador to Texas and was present when Michael provided the $10,000 to Burgos. He stayed with Michael while they waited for Burgos, who never came back with the marijuana, and while they spoke to Dinwiddie on the phone and decided to go home on the bus. He testified to

Dinwiddie's anger and to Meador's telling Dinwiddie that he could set up Burgos for him. Billy Meador testified that he was also present in April when Burgos and Raul Cruz arrived at the grandmother's house with marijuana. He testified that the grandmother routinely kept a .32 caliber pistol under her pillow in the bedroom of the house. When Billy began to tell Burgos that Dinwiddie was angry "and would like to smoke him," Michael cut him off. He testified that Michael told him he was going to contact Dinwiddie, and later told him he had done so. Billy was not present during the murder the next day, but testified that afterward Michael told him it was not safe for him to remain at the location because "Dennis slumped Sergio in the back of the head and put him in the trunk." Meador's counsel vigorously cross-examined Billy, establishing, among other things, that he had refused to talk to the defense investigator who attempted to interview him, although he had met with the prosecutors on numerous occasions, and that there were certain inconsistencies between his testimony and his prior statements to the police and to the grand jury.

Genalle Brown testified that she had been Dinwiddie's girlfriend, that he had been involved in selling marijuana with some Mexicans, and she had previously wired money to Texas for him. She testified that the night before the murder he was at her house when he received a telephone call. She heard Dinwiddie say: "Is he there?," followed by, "I'm on my way;" Dinwiddie then borrowed her car. She

had previously had a .45 caliber handgun in her house that she later realized was missing. On cross-examination, Brown admitted that she initially gave false statements to the police.

Maria Alanis, Burgos's girlfriend, testified that Meador had lived with her and Burgos for a while, and that Burgos, Meador and Dinwiddie were all three involved with one another in the marijuana business.

Michael Jeremy Hunt testified that he had known Meador all his life and assisted him in packaging and distributing marijuana. He was present when Burgos and Cruz showed up at the house the night before the murder. He heard Meador on the telephone giving someone directions to the grandmother's house. He later saw Dinwiddie and James with weapons, and recognized the weapon James had as being the one the grandmother kept under the pillow. Hunt testified that when Burgos and Cruz arrived at the house (where Dinwiddie and James were hiding with the weapons), Meador told him to "go in the bathroom because they're going to kill them." From the bathroom, he could hear yelling and sounds of people being beaten up, and he and Meador climbed out the bathroom window. He then heard three or four shots, and later saw Cruz dragging Burgos's body to the car. He saw Meador talking to Dinwiddie, and after that Dinwiddie gave Hunt a crucifix that Burgos had been wearing. Hunt testified that he later helped Meador clean up the house and burn evidence, including Burgos and Cruz's cell phones.

Lawan James testified that Dinwiddie called him the morning of April 22 and asked him to ride to Missouri to "have his back." He testified that during the drive Meador had called to say Burgos was there and "if he wanted him, come and get him." When they arrived at Meador's grandmother's house, Meador told Dinwiddie and James that Burgos had been saying that Dinwiddie was "soft and a bitch." Meador urged Dinwiddie to take action, "end it," and "fuck him"; otherwise, he said, there would be a "backlash" from Burgos. James testified that Meador retrieved a gun from under the pillow on the bed and gave it to James. James, Meador, and Dinwiddie then drove to a motel where Burgos and Cruz were staying. Meador pointed out the car Burgos and Cruz had been driving, and when Dinwiddie indicated he would go to the hotel room, Meador told him not to. James quoted Meador as saying "because you're going to have to do something to them, and we don't want to cause no scene at the hotel. You can go back to my grandmother's house, and whatever happens there happens."

James testified that they then went back to the grandmother's house, but this time parked where Dinwiddie's car would not be visible. When Burgos and Cruz drove up, Meador told Dinwiddie and James to hide in the bedroom. When Burgos and Cruz entered, Dinwiddie and James emerged from hiding, and Dinwiddie began beating Burgos. Meador and Jeremy Hunt went into the bathroom. Dinwiddie and Burgos argued about the marijuana and missing money. Dinwiddie

then ordered Burgos and Cruz to the bedroom, where the argument continued.

James testified that Dinwiddie left the room a couple of times, then came back and

said to Burgos, "Mike said that you said I was a bitch, so I'm a bitch." Dinwiddie

then shot Burgos twice, and he told James to shoot Burgos, which James did.

Dinwiddie also shot Cruz in the leg. James and Cruz put Burgos's body in the

trunk of the car Burgos and Cruz had arrived in. James testified that while he was

moving the body, Dinwiddie and Meador were standing near the house laughing.

Cruz and James drove the car with the body and Dinwiddie followed in his car.

During the drive, Dinwiddie relayed directions given to him by Meador to the rural

site where they dumped the body.

Meador did not testify at trial, but portions of his video-recorded statements

were played to the jury. In his very extensive video-recorded interview, he said

that he had been involved in marijuana dealing with some unidentified Haitians,

who were responsible for Burgos's murder.

The affidavit Meador provided with his reply brief is entirely different from

the video-recorded statement that Meador gave to the police, and is entirely

different from the overwhelming evidence presented at trial. Meador says he never

participated in selling marijuana with Dinwiddie, that the Texas trip was a deal

strictly between him and Burgos, not Dinwiddie, that Billy Meador's trial

testimony was false, and that he himself had called Lawan James in April after he

realized he did not need all the marijuana that Burgos had brought to Missouri. The affidavit says that Lawan James came into the grandmother's house alone and suddenly pulled out a weapon. It says that Meador escaped from the house, heard the gunshots, and later encountered Dinwiddie outside. The affidavit also says that Dinwiddie did not travel to Missouri with Lawan James, but instead came with an auto mechanic to see Meador about a car.[1]

Meador also provided an affidavit from Dinwiddie, which says that Dinwiddie knew Meador was not involved in the killing and wanted to testify at Meador's trial to that effect. Dinwiddie's affidavit explains that he simply went to Missouri to check on a car, and was with an auto mechanic.[2] The government provided reports of this auto mechanic's three different police interviews, in which the mechanic stated that Dinwiddie was in Tennessee or Kentucky on the day of the murder. Docket # 13-2, 13-3, 13-4.

## Discussion

Under 28 U.S.C. § 2255, a federal prisoner may seek relief on the ground that "the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise

---

[1] Meador provided this same affidavit in support of Dinwiddie's §2255 motion, Case No. 1:12CV33CDP, docket # 4, at p. 5-7.
[2] In Dinwiddie's §2255 case, the auto mechanic provided an affidavit stating that he traveled with Dinwiddie to Missouri to look at a car. Case No. 1:12CV33CDP, docket # 6, at p.3.

subject to collateral attack. . . ." 28 U.S.C. § 2255.  A motion pursuant to § 2255 "is 'intended to afford federal prisoners a remedy identical in scope to federal habeas corpus.'"  *United States v. Wilson*, 997 F.2d 429, 431 (8th Cir. 1993) (quoting *Davis v. United States*, 417 U.S. 333, 343 (1974)).

Grounds 1, 3, and 5 – Prosecutorial Misconduct

In each of these grounds, Meador claims that his due process rights were violated.  Meador did not raise any of these claims either at trial or on appeal, and so they are not properly before the court on this § 2255 motion.  *See Massaro v. United States*, 538 U.S. 500, 504 (2003); *United States v. Frady*, 456 U.S. 152, 162–166 (1982).  I could summarily deny them for that reason alone.  However, because some of Meador's claims of ineffective assistance of counsel are based on these same allegations, and because they are so clearly refuted by the record, I will discuss them on the merits.

Meador argues that the government presented inconsistent theories at his and Dinwiddie's trials, but he has not pointed to any actual inconsistencies.  Under certain circumstances, presentation of inconsistent prosecutorial theories can violate due process.  *See Smith v. Groose*, 205 F.3d 1045, 1049–52 (8th Cir. 2000).  To violate due process, the conflicting theories must be "inherently factually contradictory."  *Id.* (examining codefendant's conflicting testimony regarding when a murder occurred). This does not mean, however, that justice requires

prosecutors to "present precisely the same evidence and theories in trials for different defendants." *Id.* at 1052.

The two trials here were very similar, though not identical, because it was necessary that each trial focus on the actions of that particular defendant. The government presented the same story, the same key witnesses, and the same theory. The key witnesses who were on the scene during the actual murder – Lawan James and Jeremy Hunt – testified to the same thing at both trials.[3] Billy Meador, Genalle Brown, and Maria Alanis also testified entirely consistently. Although Meador says that the witnesses "altered their respective testimonies in significant degrees," he points to no examples showing that this happened. Indeed, as set out above, the Court of Appeals consolidated the appeals and provided one set of facts, which is entirely consistent with the evidence presented at each trial. I presided at both trials and have reexamined both transcripts, and I found no significant differences. Although the testimony may not have been identical in the two cases, it was never inconsistent. This claim is without merit.

Meador also claims that his due process rights were violated in the government's handling of Raul Cruz. He argues that Cruz should have been called to testify at his trial, and he insinuates that the government somehow acted

---

[3] James gave an extensive video-recorded confession after he was arrested. Although that video was not shown to either jury, it was the subject of his motion to suppress and it was entirely consistent with his testimony at both trials.

improperly when the charges were "mysteriously" dismissed and when Cruz was released on bail. The charges against Cruz were dismissed without prejudice in June of 2009, two months after the conclusion of Meador's trial. As set out in the government's motion to dismiss the case against Cruz, ECF No. 619 in Case No. 1:06CR134CDP, Cruz was at that time facing prosecution for felony murder in New Madrid County Circuit Court in relation to the murder of Burgos, and the federal prosecutors chose to dismiss the federal charges "in deference to the state prosecution." This had no effect on Meador's constitutional rights. Additionally, there is no duty on the government to call all witnesses to an event. *See United States v. Williams*, 481 F.2d 735, 737 (8th Cir. 1973) ("Absent unusual circumstances such as knowingly concealing evidence favorable to a defendant, the Government has a wide discretion with respect to the witnesses to be called to prove its case.") (quoting *United States v. Mosby*, 422 F.2d 72, 74 (8th Cir. 1970)).

Meador has also not shown that Cruz would have testified instead of invoking the Fifth Amendment privilege against self-incrimination. Although the government cannot intimidate witnesses to keep them from testifying, *see United States v. Habhab*, 132 F.3d 410, 415–16 (8th Cir. 1997), if a witness chooses to invoke the privilege, neither the defendant nor the government can call the witness. Cruz was himself facing serious criminal charges. And of course, there is no reason to believe that Cruz's testimony would have helped Meador. Cruz's

statements to the police show that Meador called them to the house, visited with Dinwiddie after the murder, gave them directions to the place to dump the body, and destroyed evidence afterward.  There is no reason to believe that Cruz would have testified at trial; but if he had, there is no reason to believe he would have testified in any way that was favorable to Meador.  Meador cannot show that his due process rights were violated by Cruz's absence from the trial.

<u>Grounds 3 and 4:  Ineffective Assistance of Trial and Appellate Counsel</u>

Meador claims that trial and appellate counsel[4] were ineffective in almost every way possible.  Most of his arguments about ineffective assistance simply reargue the evidence and assert that his lawyers should have been able to prove that he was not guilty.  But as the Court of Appeals found, the evidence of Meador's guilt was overwhelming.  Meador points to nothing that his counsel did that fell below the standards required by the constitution or that could have changed the outcome.

To succeed on a claim of ineffective assistance of counsel, the convicted defendant must prove (1) that counsel's performance was deficient in that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment" and (2) that counsel's "deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  To prove

---

[4] Meador was represented by the same counsel at trial and on appeal.

*Strickland*'s first prong, deficient performance, a movant must demonstrate that

"counsel's representation fell below an objective standard of reasonableness." *Id.*

at 688. When evaluating counsel's performance, a court "must indulge a strong

presumption that counsel's conduct falls within the wide range of reasonable

professional assistance." *Id.* at 689. In addition, the objective reasonableness of

counsel's performance is assessed "in light of professional norms prevailing when

the representation took place." *Sinisterra v. United States*, 600 F.3d 900, 906 (8th

Cir. 2010).

Even if sufficient proof exists with respect to the first prong, relief may only

be obtained if a petitioner also meets the second prong by proving that the deficient

performance actually prejudiced the case. *Strickland*, 466 U.S. at 697. A movant

must demonstrate that "there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different." *Id.*

at 694. This showing of a "reasonable probability" of a different outcome is less

than a preponderance of the evidence but greater than just a possibility; it "is a

probability sufficient to undermine confidence in the outcome." *Paul v. United

States*, 534 F.3d 832, 837 (8th Cir. 2008) (quoting *Strickland*, 466 U.S. at 694).

The court may address the two *Strickland* prongs in any order, and if a petitioner

fails to make a sufficient showing of one prong, the court need not address the

other prong. *See Strickland*, 466 U.S. at 697; *see also Fields v. United States*, 201

- 17 -

F.3d 1025, 1027 (8th Cir. 2000) ("If we can answer 'no' to either question, then we need not address the other part of the test.").

The *Strickland* standard applies to claims of ineffective assistance of appellate counsel just as it applies to claims of ineffective assistance of trial counsel. *Cf. Bear Stops v. United States*, 339 F.3d 777, 780 (8th Cir. 2003) (applying standard to claims of deficient appellate counsel).

Trial Counsel Was Not Ineffective

Meador says that counsel did not investigate the facts or interview witnesses, but he has not pointed to any witnesses who would have provided helpful testimony. At least one of the government witnesses testified on cross-examination that he had refused to talk to the defendant's investigators, which shows that counsel were, in fact, conducting an investigation. Meador provided identical affidavits from three friends or relatives who say they were not contacted by counsel. These affidavits say the witnesses would have testified that Meador's grandmother routinely kept a firearm under her pillow. But Billy Meador testified to that at trial, and Lawan James testified that Meador obtained the gun from under a pillow, so this testimony would have added nothing. To the extent they say (identically) that Billy Meador lied and that Michael Meador could never have participated in or approved of a murder, that testimony would have been inadmissible in any event. These witnesses did not have relevant evidence, there

was no reason for counsel to contact them, and Meador was not prejudiced by their absence at trial.

Meador claims that one of his two lawyers never visited him in jail, but he cannot show that this was ineffective or that it prejudiced him. Because the government initially sought the death penalty in this case, two experienced counsel were appointed under the Criminal Justice Act to represent Meador at the government's expense. After the decision was made that the government would not seek the death penalty, counsel asked that I allow both of them to continue the appointed representation. I agreed only after they assured me that they would not bill for duplicate efforts and that they had already divided the work, with one of them taking the lead in meeting with the client and the other doing other tasks. There is nothing ineffective about this division of labor, and Meador cannot show that he was prejudiced by it.

Meador contends that counsel should have called Dinwiddie to testify, and he has provided an affidavit from Dinwiddie stating that he was willing to testify. The affidavit sets forth a new theory of what transpired: that Dinwiddie traveled to Missouri with his auto mechanic to buy a car and that the murder was all James's doing. Dinwiddie's affidavit says that because he had already been to trial, there was no reason he would not have testified. Counsel was not ineffective for failing to call Dinwiddie to testify. Despite his affidavit to the contrary, there is no

reasonable likelihood that Dinwiddie would have testified at trial, given that he continued to proclaim his innocence and had not even been sentenced at that time. Additionally, Dinwiddie's affidavit is totally at odds with all other evidence in the case, including Burgos's blood being found on Dinwiddie's jeans and the recovered .45 caliber pistol being the one previously in the possession of Dinwiddie's girlfriend.[5] Even if Dinwiddie had testified, which is highly unlikely, his testimony would have been thoroughly impeached and potentially extremely damaging to Meador;[6] counsel were not ineffective for failing to seek his testimony.

Meador argues that counsel should have called Dinwiddie's auto mechanic, who would have corroborated Meador's and Dinwiddie's new version of what transpired. But the government offered three different statements the mechanic made to police; in each of which, the mechanic claimed that Dinwiddie was in Kentucky or Tennessee on the day of the murder. Given the existence of such strong impeaching evidence, counsel was not ineffective for failing to call the mechanic.

---

[5] Shell casings found at the house were matched to the gun, but the bullets themselves did not show a conclusive match.

[6] Although it was not presented in this matter, Dinwiddie's own counsel testified at his § 2255 evidentiary hearing that they decided against presenting Dinwiddie's testimony after they were unable to corroborate his story. Case No. 1:12CV33CDP, docket # 30, at p. 39.

Meador alleges that counsel were ineffective for failing to investigate Lawan James' background. Counsel, however, knew all about James' background and extensively cross-examined him about it. Meador has pointed to nothing that counsel could have done differently with regard to James that would have had any effect on the outcome of the case.

Meador claims that counsel should have objected when the government presented inconsistent theories at his and Dinwiddie's trials, but as discussed above, he has not established any inconsistencies. Similarly, counsel were not ineffective for failing to object to the government's failure to call Cruz to testify. Given what counsel knew Cruz was expected to say, they had no reason to want him to testify.

Meador says counsel were ineffective for failing to object when jurors slept during trial, but this appears to be a fabrication. There is no evidence that any jurors were sleeping during the trial. The jurors instead were quite attentive throughout the proceedings.

Meador argues that counsel were ineffective for failing to raise several legal issues. He says the jury instructions were flawed, "especially on the § 924(c) and (j) charges." This claim of ineffectiveness appears to rely on several combined arguments that were specifically rejected by the Court of Appeals. On appeal, Meador argued that there was not sufficient evidence to convict him under § 924(j)

and (c) and that he could not properly be sentenced to consecutive life under § 924(j). The Court of Appeals rejected that argument and his argument that § 924(c) and § 924(j) charge separate offenses. The Court also rejected the argument that there was more than one conspiracy (which he appears to be arguing here by saying counsel should have argued that if there was a conspiracy he had withdrawn from it). A defendant cannot be prejudiced when counsel fail to raise meritless arguments, so these ineffectiveness claims must be rejected.

Meador also contends that counsel were ineffective for failing to object to the Pre-sentence Report's conclusion that he was subject to consecutive sentences. But counsel did raise that issue; it was rejected both by me and by the Court of Appeals, because the statute requires consecutive sentences for these crimes. He likewise argues that his "attorneys failed to present any evidence in mitigation at petitioner's sentencing hearing." But his counsel presented a mitigation expert who provided extensive testimony at sentencing. These are two more examples of argument that is completely contradicted by the facts.

Meador argues that counsel should have sought to disqualify me because, he says, I "openly professed [my] bias and hostility to Michael Meador." He says this "bias" is shown by my comments at sentencing. It is true that I stated at the sentencing that I believed Meador was dangerous and I believed the evidence showed that he was a leader in the sense that he put the events in motion that lead

to the death of Burgos.  Those statements were based on the evidence in the case, and Meador has pointed to nothing that would constitute bias or prejudice requiring recusal.  *See United States v. Oaks*, 606 F.3d 530, 537 (8th Cir. 2010) (adverse rulings or statements based on evidence of case do not show judicial bias).

Meador argues that counsel were ineffective for failing to prepare him to testify at trial.  But at trial I inquired specifically whether he wished to testify and he stated that he did not.  Given his video-recorded statements about the "Haitians," which the jury saw and which conflict with his new version of the events, he was wise not to testify.  In any event, he could not have been prejudiced by any failure to be prepared to testify, since he chose not to testify.

Appellate Counsel Was Not Ineffective

Dinwiddie objects that appellate counsel "failed to properly argue the issue of hearsay evidence."  But counsel did appeal my hearsay rulings and the Court of Appeals rejected that argument.  The other alleged failures of his appellate counsel are discussed above, but either the facts underlying those allegations do not exist or the failures do not provide any legal basis for relief.  For example, Meador says counsel failed to argue that the evidence did not support the § 924(c) conviction, but that was argued and the Court of Appeals rejected it.  Similarly, counsel could not have been ineffective for failing to argue that the prosecution presented

inconsistent theories at Dinwiddie's trial, because there were no inconsistent theories. Meador argues that appellate counsel failed to argue that he should have received a lesser-included-offense instruction for accessory after the fact because the evidence did not support the § 924(c) conviction, but the Court of Appels held that the evidence did support that conviction. He argues that counsel should have appealed the issue of whether he withdrew from the conspiracy, but the Court of Appeals rejected his argument that there were multiple conspiracies. He raises the curious argument that counsel should have argued self-defense. This was not raised at trial, and nothing in the evidence supports a self-defense argument. He again argues that counsel was ineffective in failing to make sentencing arguments about the interplay between § 942(c) and (j), but as noted above, counsel did make these arguments and they were rejected by the Court of Appeals.[7]

## Conclusion

Meador's claims are conclusively refuted by the record in this case, and so I will deny the motion without an evidentiary hearing. No hearing under 28 U.S.C. § 2255(b) is required "where the claim is inadequate on its face or if the record affirmatively refutes the factual assertions upon which it is based." *Anjulo-Lopez v. United States*, 541 F.3d 814, 817 (8th Cir. 2008).

---

[7] This issue is also the subject of Meador's later-filed "Rule 12(b)(3)" motion, and I am denying that motion for all the same reasons that the argument has been repeatedly rejected. The Court of Appeals' decision on this point is final, and Meador's continuing to raise the same issue over and over again does not change that fact.

As Meador has not made a substantial showing of the denial of a federal constitutional right, I will not issue a certificate of appealability. *See Cox v. Norris*, 133 F.3d 565, 569 (8th Cir. 1997); *see also Flinger v. Delo*, 16 F.3d 878, 882–83 (8th Cir. 1994) (clarifying that a substantial showing must be debatable among reasonable jurists, reasonably subject to a different outcome on appeal, or otherwise deserving of further proceedings). Accordingly,

**IT IS HEREBY ORDERED** that Michael Meador's motion to vacate, set aside, or correct sentence under 28 U.S.C. § 2255 [# 1] is denied, as are his motion pursuant to rule 12(b)(3)(B) [#23] and his motion to clarify [#24]. As I have considered the matters raised therein, Meador's motion to amend [#8] is granted, but the amended grounds provide no basis for relief.

**IT IS FURTHER ORDERED** that that this Court will not issue a certificate of appealability, as Dinwiddie has not made a substantial showing of the denial of a federal constitutional right.

A separate Judgment in accordance with this Memorandum and Order is entered this same date.

CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 18th day of March, 2015.